**Nita Klunder**
**Marc Jones***
**Attorneys for the Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**Boston Regional Office**
**33 Arch Street, 24th Floor**
**Boston, MA 02110**
**617-573-8822 (Nita Klunder)**
***Not admitted in the U.S. District for the Southern District of New York**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>                                         **Plaintiff,**<br><br>    **v.**<br><br>**JONATHAN FARBER,**<br>**AARIF JAMANI, and**<br>**BRIAN KEASBERRY,**<br><br>                               **Defendants.** | **Civil Action No. 1:24-CV-00273**<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiff, Securities and Exchange Commission ("Commission"), alleges the following against the defendants Jonathan Farber ("Farber"), Aarif Jamani ("Jamani"), and Brian Keasberry ("Keasberry"):

**SUMMARY**

1.      County Line Energy Inc. ("County Line") was a small California-based public company with little (and sometimes no) trading in its stock.  From no later than September 2017 through at least October 2021 ("Relevant Period"), defendants Farber, Jamani, and Keasberry ("Defendants") engaged in a fraudulent scheme to profit from their accumulating, manipulating,

and selling County Line stock to retail investors. Defendants shared the $5 million in profits from the stock sales that resulted from their scheme.

2.　　First, Defendants gained control of County Line by placing close associates or handpicked figureheads in senior management positions at County Line. Jamani and Farber guided and directed these managers to take actions beneficial to Defendants. Jamani and Farber used their influence over County Line to control how much of its stock was available in the public markets, and to allow Defendants to accumulate and control most of County Line's stock.

3.　　Next, Jamani and Farber created the false appearance of investor interest in County Line stock to attract retail investors who would be willing to buy Defendants' shares. Public trading activity in County Line stock had been virtually nonexistent when Defendants began their scheme. So Defendants created the appearance of active trading by selling that stock to friendly buyers who Farber controlled. Farber used the accounts of three individuals to purchase County Line stock. At the same time, Jamani was selling on behalf of the Defendants through an offshore brokerage firm using a nominee account. Defendants were effectively selling to themselves.

4.　　Defendants also paid for an online promotional campaign, touting the stock's great potential and pointing to press releases that Farber and Jamani caused County Line to release. But Defendants, who were the ones who would most benefit from investor interest in County Line's freely tradable stock because they owned most of it, concealed the fact that they had paid for this promotional campaign, controlled County Line, and were actively selling the majority of County Line's freely tradable stock.

5.　　Finally, Defendants completed their scheme by selling the County Line stock they controlled and profited from the demand they had generated through the promotional campaign

and manipulative stock trading.  To evade limitations placed on company insiders and sell the massive quantities of County Line stock they had accumulated, Jamani and Farber had to conceal their status as County Line affiliates.  They did so by lying to County Line's transfer agent and by selling shares through offshore nominee accounts.

6.     When Farber, Jamani, and Keasberry directed the sales of County Line stock, there were no registration statements for those sales on file with the Commission or in effect for those transactions, as required by the relevant securities laws described herein.  No exemption from the registration requirement applied.

7.     As a result of the conduct described below, Farber, Jamani, and Keasberry violated, and unless restrained and enjoined will continue to violate, Sections 5(a) and 5(c), and 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§77e(a), (c), 77q(a)(1), (3)], and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §240.10b-5(a), (c)].  As a result of the conduct described below, Farber and Jamani violated, and unless restrained and enjoined will continue to violate Section 9(a)(2) of the Exchange Act [15 U.S.C. §78i(a)(2)].

8.     The Commission seeks a permanent injunction against the Defendants, enjoining them from engaging in transactions, acts, practices, and courses of business of the type alleged in this Complaint; disgorgement of all ill-gotten gains from the unlawful conduct set forth in this Complaint, together with prejudgment interest; civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)]; an order barring the Defendants from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. §77t(g)] and Section 21(d) of the Exchange Act [15 U.S.C. §78u(d)]; an order prohibiting the Defendants from acting as officers

or directors of any issuer that has a class of securities registered pursuant to Section 12 of the

Exchange Act [15 U.S.C. § 78*l*], or that is required to file reports pursuant to Section 15(d) of

the Exchange Act [15 U.SC. § 78o(d)]; and such other relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to Section 22(a) of the

Securities Act [15 U.S.C. §77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15

U.S.C. §§78u(d), 78u(e), and 78aa].

10.     Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C.

§77v(a)] and Section 27 of the Exchange Act [15 U.S.C. §78aa].  Some of the acts, practices,

transactions, and courses of business alleged in this Complaint occurred within the Southern

District of New York.  Some of the acts, practices, transactions and courses of business alleged

in this Complaint were effected, directly or indirectly, by using means or instrumentalities of

transportation or communication in interstate commerce, or the mails.  For example, several

individuals residing in the Southern District of New York bought  County Line stock during the

deceptive promotional campaigns conducted during the Relevant Period.  In addition, Farber

took actions in furtherance of the Defendants' scheme while in the Southern District of New

York, including having payments made to an entity located in the Southern District of New

York.

## DEFENDANTS

11.     Jonathan Farber, age 57, lives in New York, New York.  Farber caused County

Line to take actions for the benefit of Defendants; purchased stock in the accounts of other

individuals to create the appearance of active trading; liaised directly with stock sale promoters

to market County Line stock, the cost of which was at least partly funded by entities he

controlled; and sold County Line stock through entities he controlled and divided the profits amongst himself, Jamani, and Keasberry.

12.     Aarif Jamani, age 56, lives in Burnaby, British Columbia, Canada.  Jamani caused County Line to take actions for the benefit of Defendants; transferred County Line stock which was ultimately sold through offshore brokerage firms and distributed the profits generated on those sales amongst himself, Farber, and Keasberry.  Beginning in September 2019, Jamani is identified in County Line public filings as a "control person."

13.     Brian Keasberry, age 60, lives in Las Vegas, Nevada.  Keasberry paid for portions of the campaigns to promote County Line stock using proceeds from County Line stock sales and helped to create the appearance of legitimately arms-length stock sales when in fact stock was only being transferred to an associate of the Defendants.  Beginning in September 2019, Keasberry is identified in County Line public filings as a "control person."

## RELATED ENTITIES

14.     County Line was incorporated in Nevada in February 1998.  During the Relevant Period, County Line Energy Inc. described its business as "manufactur[ing] and sell[ing] self-contained hydroponic systems for growing plants, vegetables, and cannabis."  County Line (stock ticker symbol: CYLC) trades on OTC Link (previously, the "Pink Sheets"), operated by OTC Markets Group, Inc.  County Line was incorporated in Nevada in 1998, and is located in Santa Ana, California.

15.     Wexford Industries Ltd. ("Wexford") is a Wyoming company controlled by Farber.  Wexford held and sold County Line stock on behalf of Defendants and divided the profits amongst Farber, Jamani, and Keasberry.

5

16.     Keasberry and Jamani were two signers for a Wexford bank account.  By March 2016, Keasberry was identified in a Wyoming Secretary of State filing as Wexford's Treasurer or Fiscal Agent.  In that same filing the "President/Director" was identified as Farber's relative ("Relative").

17.     Though Relative continued to be identified in filings as the President of Wexford, Relative was in fact retired, and Farber operated Wexford, including finding investment opportunities.  Farber and Relative lived together during intervals throughout the Relevant Period, in particular during the early months of the Covid-19 pandemic.

18.     0985358 B.C. Ltd. ("0985358") is a Canadian company controlled by Jamani who, is its president, secretary, and treasurer.  0985358 received and sold County Line stock on behalf of Defendants and divided the profits amongst Farber, Jamani, and Keasberry.

19.     Black Ridge Holdings Inc. is a Nevada company controlled by Keasberry, who is its president, secretary, and treasurer.  Black Ridge received profits from the sale of Defendants' County Line stock and made payments to multiple promoters.

20.     Blue Diamond Equities Inc. is a Nevada company controlled by Keasberry. Keasberry is the sole Director of Blue Diamond.  Both he and Jamani are signers for a Blue Diamond bank account.  Blue Diamond received profits from the sale of Defendants' County Line stock and was identified as the paying party on several County Line promotions.

## RELEVANT DEFINITIONS

21.     Before selling stock, persons who control the stock of public companies ("control persons") are required to:  (a) register the stock sales with the Commission pursuant to Section 5 of the Securities Act [15 U.S.C. §77e]; (b) sell the stock pursuant to an applicable exemption from registration; or (c) sell the stock pursuant to conditions set forth in SEC Rule 144 [17

C.F.R. §240.144], including limitations on the amount of stock a control person can legally sell.  These registration requirements, sale restrictions, and disclosure obligations are safeguards designed to inform investors about the nature of the stock they are holding or considering buying, and about those from whom they would be buying that stock.

22.     An "affiliate" of a publicly traded company (also known as an "issuer") is a person or entity that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such issuer (i.e., a control person).  "Control" means the power to direct management and policies of the company.  Affiliates include officers, directors and controlling shareholders, as well as any person who is "under common control" with, or has common control of, an issuer.  Without registration of the stock, affiliates are only permitted to sell a small percentage of the outstanding shares of a stock according to SEC Rule 144 [17 C.F.R. §230.144].  A group of individuals or entities acting in concert may collectively be an "affiliate" of an issuer.

23.     "Restricted stock" is stock of an issuer acquired either from that issuer or an affiliate of that issuer, in a private transaction that is not registered with the Commission.  Absent an exemption under the federal securities laws and rules, restricted stock cannot legally be offered or sold to the public unless a securities registration statement has been filed with the Commission (for an offer) or is in effect (for a sale).  Those registration statements are submitted and filed with the Commission on Form S-1 and are known as "S-1 registration statements."  The S-1 registration statement contains important information about an issuer's business operations, financial condition, results of operation, risk factors, and management.

24.     "Unrestricted stock" is stock that may legally be offered and sold in the public marketplace by a non-affiliate, ordinarily having previously been subject to a registration

statement filed with the Commission.  Registration does not attach to the security itself, and registration at one stage for one party does not necessarily suffice to register subsequent offers and sales by the same or different parties.  Thus, when a control person buys publicly-traded or otherwise unrestricted shares in the company that person controls, those shares automatically become subject to the legal restrictions on sales by an affiliate, which strictly limit the quantity of shares that may be sold in the public markets absent registration.  Without registration, affiliates are prohibited from selling large quantities of an issuer's shares, no matter how the affiliates obtained those shares.

25.     The Over-the-Counter ("OTC") Markets is a stock quotation service that facilitates public trading of shares in public companies that are not otherwise listed on national securities exchanges (like NASDAQ or the New York Stock Exchange).  Public companies that do not have an obligation to file reports with the Commission may, nonetheless, choose to file public reports (such as quarterly and annual statements and other periodic disclosures) on the OTC Markets website for investors to review and consider when making investment decisions.

26.     A "beneficial owner" of a security is any person who, directly or indirectly, through any contract arrangement, understanding, relationship, or otherwise, has or shares investment power, which includes the power to dispose, or to direct the disposition of, such security.

27.     A "penny stock" is defined in Section 3(a)(51) of the Exchange Act and in Rule 3a51-1 thereunder as an equity security that does not meet certain exemptions—essentially, most stocks that do not trade on a national securities exchange, that trade under $5 per share, and whose issuers do not meet certain thresholds of tangible assets or revenue.  County Line stock was a penny stock during the Relevant Period.

## THE FRAUDULENT SCHEME

28.     The Defendants worked together to exert control over County Line's management, gain control over the company's unrestricted shares, and sell them at a tremendous profit all while concealing their true roles with respect to company management and stock ownership to avoid the stock sale limitations that applied to affiliates.

29.     To sell these County Line shares, the Defendants needed investors willing to buy them.  In order to attract investors, they created the appearance of an active market by simultaneously selling and buying County Line stock.  Then, the Defendants funded a promotional campaign to bring in additional investors who would buy the stock the Defendants were holding and trying to sell at a profit.

30.     Jamani kept track of Defendants' County Line stock sales and proceeds in a notebook.  That notebook also included how the funds were distributed, reflecting payments to Farber's entities and Keasberry's entities.

31.     As a direct result of their scheme, the Defendants sold over 15 million shares of County Line stock for profits of over $5 million dollars through entities which concealed their control of the stock and true roles in the scheme.

### Farber, Jamani, and Keasberry were Affiliates of County Line

32.     Throughout the Relevant Period, as detailed below, Farber, Jamani, and Keasberry were affiliates of County Line because as a group they controlled management and held a significant portion of County Line's unrestricted stock.  During this time County Line had a series of CEOs who were either longtime associates of Jamani or Farber, handpicked by them, or both.  Each of these CEOs took corporate actions based on direction and or input from Jamani or Farber.

33.      By the fall of 2018, a longtime associate of Jamani's was nominally County Line's Chief Executive Officer and Director ("CEO1").  Jamani had initially approached CEO1 to do County Line's accounting.  CEO1 had done accounting work for other penny stock companies with which Jamani was affiliated.  For one of those companies, Company1, Keasberry served as the president and director.

34.      CEO1's actual involvement with County Line appears to have been minimal, however.  CEO1 had never been the CEO of any other public company, and in 2023 he did not recall having served as County Line's CEO nor whether he received a salary as CEO.

35.      On January 4, 2018, County Line effected a reverse stock split in which every 1,000 County Line shares held by shareholders were exchanged for a single share.  By reducing the number of outstanding shares, Defendants could more easily guarantee that they controlled the majority of the stock deposited with brokerage firms and available for public trading (the "float").  Each additional share issued after the reverse split constituted a far greater percentage of the float than was the case before.  CEO1 processed the reverse split after discussions with Jamani.

36.      On March 15, 2018, Farber caused Wexford to transfer $10,020 to an individual who would soon become County Line's next CEO ("CEO2").  Just six days later, County Line issued CEO2 100 million County Line shares for $10,000.  After the issuance to CEO2, County Line had a total of just over 102 million shares outstanding.  This Farber-funded purchase placed nearly 98% of County Line common stock in CEO2's name.  The following week, CEO2 was appointed officer and director of County Line.

37.      At that time, according to OTC Markets filings, CEO2 was the President, Secretary, and Treasurer of Company1, while Keasberry served as the Director of Company1.

Recent OTC Markets filings show Jamani as the President, Secretary, Treasurer, and Director of Company1.

38.     In early 2018, a new person ("CEO3") was approached by an associate of Farber's to see if he would consider becoming CEO of County Line. By March 2018, Jamani and Farber were in discussions with CEO3 about his prospective role. In a subsequent phone call between CEO3, Farber's associate, and Farber, CEO3 was told that Farber would fund CEO3's business if he became CEO and merged his business, a grow box company, into County Line. CEO3 learned that Farber worked with Jamani and that Jamani was also part of the commitment to fund CEO3's business.

39.     On July 5, 2018, CEO3 became the President, Chief Executive Officer, Secretary, and Treasurer of County Line and was given a seat on the board. That same day, CEO3 acquired 70 million of CEO2's 100 million shares at a price of one hundredth of a cent per share. Less than two months later, at Farber's instruction, CEO3 cancelled 30 million of the 70 million shares he had received.

40.     A month after he joined County Line, CEO3 was given 2 million shares in lieu of salary.

41.     During CEO3's tenure as County Line's CEO, he communicated with an associate of Farber and Jamani's ("Associate1"). Associate1 communicated frequently with Farber, Jamani, and one other person. CEO3 understood that Associate1 passed on instructions from Farber, Jamani, and the third person.

42.     Associate1 repeatedly told CEO3 to issue press releases regarding minor events. Associate1 indicated that Farber wanted the press releases out and that the reason was to keep the

stock price up.  Without these instructions, CEO3 would not have caused County Line to issue these releases, as the topics did not merit them.

43.     In October 2018, CEO3 asked County Line's transfer agent to issue a total of 2,225,000 shares to three different shareholders.  Associate1 intervened and instructed the transfer agent that those shares would come from CEO3's shares, not be issued by County Line.

44.     CEO3 resigned from County Line around December 2018.  After resigning, CEO3 received phone calls from Jamani during which Jamani told him that the 40 million County Line shares he had initially received from CEO2 were not CEO3's and CEO3 needed to return them.

45.     In or around June 2019, an individual who joined County Line with CEO3 became CEO of County Line ("CEO4").  As before, Jamani continued to determine the timing of County Line press releases.  CEO4 understood that Jamani worked on County Line's press releases as part of his role as County Line's Secretary which CEO4 believed Jamani assumed in late 2019 or early 2020.  However, Jamani was not disclosed in public filings as the company's Secretary until the end of 2022.

46.     CEO4 and Jamani communicated while CEO4 served as CEO of County Line. CEO4 contacted Jamani repeatedly about the company's financials and filings, writing on one occasion "AJ you need to respond [sic] my email regarding our filing with OTC."  Later, after having provided some financials to Jamani, CEO4 wrote, "I have tried to reach you several times.  I need answers!!"   CEO4 often expressed urgency about speaking with Jamani and the two discussed topics from "upcoming goals" to whom to hire for paid advertising.  CEO4 even contacted Jamani when he was unable to access County Line's OTC account and needed a

username and password.  In November 2021, Jamani and CEO4 also discussed CEO4 meeting with Farber and Jamani while Farber was visiting Malibu.

47.     In 2021, County Line stock was not permitted to trade in Canada by order of the British Columbia Securities Commission because it failed to file the necessary records.  During that time, Jamani wrote to CEO4, "Can you get the county line share transfer journal from the beginning of 2018 to present from [the transfer agent].  I need it for my fight with BC Securities Commission.  If I lose I may end up declaring bankruptcy…"  Without the ability to sell County Line stock, Jamani was facing bankruptcy.

48.     In County Line's OTC Markets filing from the period ending September 30, 2019, Jamani, Keasberry, and Farber's Wexford, were all identified as control persons of County Line. The three continued to be identified in County Line's quarterly and annual filings with OTC Markets from the September 30, 2019 filing through the remainder of the Relevant Period.

### The Defendants Consolidated Control over the County Line Float and Caused False Statements to be Made so that Their Shares Could be Sold to the Public

49.     During early 2018, Defendants had begun trying to amass County Line shares and then fraudulently sell the County Line shares they controlled.  For example, less than a week after County Line issued CEO2 100 million newly created restricted shares of common stock, the company issued Jamani's entity, 0985358, 1.35 million shares as part of a purported debt conversion.

50.     The issuance of restricted, non-trading, shares to CEO2, later transferred to CEO3, allowed Defendants to issue themselves millions of shares without exceeding the critical threshold of 10% of total outstanding shares.  Transfer agents applied additional scrutiny when determining whether stock held by shareholders holding over 10% of a company's total outstanding shares should be treated as unrestricted.

13

51.     Because the shares Jamani's entity was issued had not been registered, they were issued as restricted and bore a restrictive legend indicating their status as restricted shares.  To be able to sell those shares without registration and in the quantity and time frame Defendants wanted, they needed to be subject to an exemption from registration.  Based on an exemption, Jamani could then ask the transfer agent to remove the restrictive legend so the shares could be transferred and sold.  To establish that such an exemption exists, shareholders like Jamani must get an opinion letter from an attorney indicating that the shares are exempt from registration requirements and that the restrictive legend can be lifted.

52.     On April 5, 2018, Jamani sought an attorney opinion letter so that he could have the transfer agent remove the restrictive legend from his 1.35 million County Line shares.  The attorney responded, "OTCMarkets website shows only 2,109,175 shares outstanding at March 13, 2018.  You need to stay under 10% to avoid being an affiliate.  These conversions add up to more than that."  Jamani replied, "I just spoke to issuer….  They assure me the number is over 100mm."

53.     On April 6, 2018, the attorney provided Jamani with an opinion letter which noted that the 1.35 million shares were less than "10% of the Issuer's 103,459,138 outstanding shares of common stock at March 31, 2018."  Without the 100 million share issuance to CEO2 two weeks earlier, the 1.35 million shares controlled by Jamani would have been nearly 40% of the total outstanding shares.  If Jamani, via 0985358, had held nearly 40% of the total outstanding shares, he would have been presumptively considered an affiliate of County Line and not been able to sell all those shares at once.

54.     The issuance of the 1.35 million shares gave Defendants control of over 96% of the float.  By controlling the float, Defendants could prevent third parties from taking advantage

of the demand Defendants were paying to generate, depressing share prices, and undercutting

their profits.

55.     As part of the process to have the restrictive legend removed from this County

Line stock, Jamani falsely communicated to the transfer agent that 0985358, a company he

controlled, was not an affiliate of County Line.  Jamani repeatedly caused false representations to

be made in attorney opinion letters as well as shareholder representation letters.  In these, Jamani

falsely represented that 0985358 was not an affiliate of County Line.

56.     On at least the dates indicated in the chart below, Jamani provided attorney

opinion letters to the transfer agent to get the restrictive legend removed from the referenced

County Line shares.  Each of the opinion letters contained the following language:  "We are

informed and assume for purposes of this opinion that [0985358] is not a current or former

officer, director, 10% shareholder or other affiliate or insider of the Issuer."

| Date of Opinion Letter | Shares for Which Jamani Sought to Remove the Restrictive Legend | Date of Shareholder Representation Letter |
|---|---|---|
| July 6, 2018 | 864,062 | * |
| October 5, 2018 | 756,904 | October 8, 2018 |
| August 8, 2019 | 5,299,999 | * |
| November 26, 2019 | 1,000,000 | November 28, 2019 |
| December 13, 2019 | 2,200,000 | December 13, 2019 |
| December 30, 2019 | 2,000,000 | January 3, 2020 |

* The Commission does not have shareholder representation letters relating to these shares.

57.     Jamani also frequently signed shareholder representation letters on behalf of

0985358 which stated, "I request that the restrictive legend be removed from my stock

certificates… of County Line…, because I am not an affiliate… and have met all requirements of

Rule 144.  In connection with my request I hereby represent: … I am not now, and have not been

during the preceding three months, an officer, director, or more than 10% shareholder of [County

Line] or in any other way an 'affiliate' of [County Line] (as that term is defined in Rule

15

144(a)(1)), nor has… any corporation or organization of which I am the beneficial owner[.]" Jamani provided these letters to the transfer agent as part of the process to have the restrictive legend removed from County Line shares held by 0985358.  The chart above shows the shares and the date of the associated shareholder representation letters provided to the transfer agent by Jamani.

58.     The statements in the opinion letters and shareholder representation letters identified in the chart in paragraph 56 were false because Jamani, who controlled 0985358, was an affiliate of County Line based on Defendants' control of the float and based on his control over management and the operations of County Line.

59.     Farber likewise caused false representations to be made to County Line's transfer agent about Wexford's, and accordingly his, status as a County Line affiliate.

60.     On at least the dates indicated in the chart below, Farber provided opinion letters to the transfer agent to have the restrictive legend removed from the referenced County Line shares.  Each of the opinion letters contained the following language:  "We are informed and assume for purposes of this opinion that [Wexford] is not a current or former officer, director, 10% shareholder or other affiliate or insider of the Issuer."

| Date of Opinion Letter | Shares for Which Farber Sought to Remove the Restrictive Legend | Date of Shareholder Representation Letter |
| --- | --- | --- |
| December 30, 2019 | 2,000,000 | January 3, 2020 |
| April 20, 2020 | 2,000,000 | April 24, 2020 |
| May 1, 2020 | 606,000 | May 6, 2020 |
| July 28, 2020 | 3,116,504 | July 28, 2020 |
| November 3, 2020 | 3,800,000 | November 6, 2020 |

61.     Farber also provided County Line with shareholder representation letters signed by Relative on behalf of Wexford.  Farber provided these letters to the transfer agent as part of the process to have the restrictive legend removed from County Line shares held by Wexford.

The chart above shows the shares and the date of the associated shareholder representation letters provided to the transfer agent by Farber.

62.    The shareholder representation letters were all signed by Relative and came in three versions.  The first was identical to that used by Jamani above and was used for the Wexford shares on January 3, 2020.  The April and May shareholder representation letters stated, "The Undersigned is not at present and has not been during the preceding three months, an officer, director, or 10% shareholder of [County Line] or in any other way an 'affiliate' of [County Line] within the meaning of Rule 144(a)(1) of the Securities Act."  The July and November shareholder representation letters read in relevant part, "I request that the restrictive legend be removed from my stock certificates… of County Line…, because I am not an affiliate… and have met all requirements of Rule 144.  In connection with my request I hereby represent: … I am not now, and have not been during the preceding three months, an officer, director, or more than 10% shareholder of [County Line] or in any other way an 'affiliate' of [County Line] (as that term is defined in Rule 144(a)(1)), nor has… any corporation or organization of which I am the beneficial owner[.]"

63.    The statements in the opinion letters and shareholder representation letters identified in the chart in paragraph 60 were false because Farber, who controlled Wexford, was an affiliate of County Line based on his control of the float and based on his control over management and the operations of County Line.

64.    Even though the shareholder representation letters were signed by Relative, Farber caused these false statements to be transmitted to the transfer agent so that the restrictive legend would be removed from the stock held by Wexford.

65.     Farber and Jamani knew or were reckless in not knowing that they were County Line affiliates.

### The Defendants Used Others to Buy and Sell Stock and
### Created the False Appearance of Active Trading in County Line Stock

66.     Next Defendants needed to sell their accumulated County Line stock to realize profits from their fraudulent scheme.  This portion of their scheme involved two steps: First, Farber placed purchase orders in accounts he controlled creating a volume of sales in the market for County Line shares that did not previously exist to give the appearance of those shares being actively traded by interested market participants.  Prior to Farber's efforts, trading in County Line stock had been between sparse and nonexistent (as detailed below).  Second, Defendants used that volume, in addition to the timing of the press releases they caused to be issued, to buttress a promotional campaign they funded. This promotional campaign was designed to target retail investors and persuade them to buy the County Line stock that Defendants were selling.

67.     For the first step, Farber bought County Line stock in the accounts of three of his associates.  This created the appearance that independent investors were interested in purchasing County Line stock.

68.     Account Holder1, age 62, is a New York resident, former girlfriend, longtime friend, and roommate of Farber's.  She gave Farber access to her online brokerage account during the Relevant Period and he used her brokerage account to buy and sell County Line stock.

69.     Account Holder2, age 30, is a New York resident and Farber's current girlfriend.  She gave Farber access to her online brokerage account during the Relevant Period and he used her brokerage account to buy and sell County Line stock.

70.     Account Holder3, age 64, is a Washington State resident and longtime associate of Farber's.  He gave Farber access to his online brokerage account during the Relevant Period

and Farber used Account Holder3's brokerage account to buy and sell County Line stock.

71.     Not only did Farber use the accounts of Account Holder1, Account Holder2, and Account Holder3 (together the "Farber Controlled Accounts") to trade County Line, he used the Farber Controlled Accounts to trade in the stock of five other penny stock companies.

72.     During early June 2018, Jamani transferred 0985358's 1.35 million shares of County Line to an offshore entity that held those shares on behalf of the Defendants.  The entity transferred those shares, now in its name, to an offshore brokerage firm ("Firm") that had the ability to sell them on the public market.  About a week later, Firm began to sell those shares.  The proceeds of the sales were then sent back to 0985358.

73.     On June 15, 2018, after there was no trading activity for the prior 16 days, Farber used the Farber Controlled Accounts to buy County Line stock.  The purchases in the Farber Controlled Accounts constituted 84% of all purchases on June 15, 2018.

74.     On the same day, Jamani, on behalf of Defendants, caused 7,436 County Line shares to be sold through Firm, which constituted 94% of the sell side.  Jamani and Farber were effectively controlling both the buy and sell sides of the public market for County Line shares.  In other words, they were effectively selling to themselves.

75.     The chart below illustrates the lack of any market activity from January 4, 2018, following the reverse split, to June 15, 2018, during which time a total of 4,592 County Line shares were traded over a total of 19 days.  The chart also shows Jamani and Farber's coordinated buy and sell activity starting on June 15, 2018.  As of that date, Defendants held approximately 96% of the shares available to sell to the public.

**County Line Market Trading Activity From the Stock Split on January 4, 2018 Through June 29, 2018**

| County Line Trade Date | Total Market Volume | Shares Bought by Farber Controlled Accounts | Farber Controlled Accounts % of Buy-Side Volume | Shares Sold by Defendants | Defendants % of Sell-Side Volume |
|---|---|---|---|---|---|
| 2/7/2018 | 45 | | 0% | - | 0% |
| 2/15/2018 | 455 | - | 0% | - | 0% |
| 2/16/2018 | 215 | - | 0% | - | 0% |
| 2/23/2018 | 122 | - | 0% | - | 0% |
| 2/27/2018 | 283 | - | 0% | - | 0% |
| 3/2/2018 | 300 | - | 0% | - | 0% |
| 3/14/2018 | 100 | - | 0% | - | 0% |
| 3/16/2018 | 100 | - | 0% | - | 0% |
| 4/5/2018 | 290 | - | 0% | - | 0% |
| 4/6/2018 | 465 | - | 0% | - | 0% |
| 4/11/2018 | 150 | - | 0% | - | 0% |
| 4/13/2018 | 120 | - | 0% | - | 0% |
| 4/20/2018 | 100 | - | 0% | - | 0% |
| 4/30/2018 | 100 | - | 0% | - | 0% |
| 5/3/2018 | 100 | - | 0% | - | 0% |
| 5/7/2018 | 511 | - | 0% | - | 0% |
| 5/24/2018 | 100 | - | 0% | - | 0% |
| 5/29/2018 | 1,036 | - | 0% | - | 0% |
| 6/15/2018 | 7,944 | 6,660 | 84% | (7,436) | 94% |
| 6/18/2018 | 14,502 | 13,050 | 90% | (14,500) | 100% |
| 6/19/2018 | 34,088 | 17,750 | 52% | 0 | 0% |
| 6/20/2018 | 1,500 | 1,000 | 67% | (1,500) | 100% |
| 6/22/2018 | 2,000 | 1,000 | 50% | (2,000) | 100% |
| 6/25/2018 | 502 | - | 0% | 0 | 0% |
| 6/26/2018 | 23,399 | 4,400 | 19% | (18,734) | 80% |
| 6/27/2018 | 5,300 | 4,900 | 92% | 0 | 0% |
| 6/28/2018 | 11,826 | 3,223 | 27% | (5,240) | 44% |
| 6/29/2018 | 4,234 | 1,028 | 24% | (2,300) | 54% |

76.     In addition to selling through Firm, Defendants also transferred their County Line shares to an offshore intermediary that ultimately transferred the shares to another offshore brokerage firm which sold them to the public on behalf of Defendants.

77.     Farber's use of the Farber Controlled Accounts to purchase County Line stock created the appearance of genuine market activity.

78.     In addition to buying and selling County Line stock in the public market through the Farber Controlled Accounts, Defendants also used Account Holder3 to nominally purchase County Line shares in a private transaction.

79.     On April 17, 2018, Keasberry's Black Ridge wired Account Holder3 five thousand dollars.  On June 6, 2018, Keasberry sent Account Holder3 wire instructions to send back five thousand dollars to Black Ridge for the purchase of a County Line note which Account Holder3 would then convert into shares.  Keasberry also sent Account Holder3 instructions and the form to send to CEO2 to convert that note into shares of County Line.

80.     The next day, Keasberry emailed Account Holder3 the paperwork required to have the shares from the note conversion issued without a restriction on resale of those shares. Keasberry told Account Holder3 to email the documents to the attorney Jamani had used for his legal opinions so Account Holder3 could get a legal opinion for his shares.  Keasberry instructed Account Holder3 to include his "proof of payment of the $5,000 to Black Ridge Holdings."  Less than two weeks later, the attorney emailed Account Holder3 the opinion letter.  Account Holder3 forwarded that email to Jamani and Farber.

81.     On June 27, 2018, Jamani emailed Account Holder3 attaching the purchase and sale agreement of the County Line note.  Jamani wrote that he did not have a signed copy and needed it so that he could transfer the stock.  Account Holder3 promptly replied attaching the signed agreement.

82.     Farber and Jamani knew or were reckless in not knowing that the stock sold through Firm and purchased using the Farber Controlled Accounts created actual or apparent active trading.

83.     Defendants used the trading described above to induce retail investors to purchase County Line stock.

## The Defendants' Digital Promotion of County Line Stock

84.     During the month that Defendants were creating the appearance of genuine market activity by dominating the buy and sell sides of County Line stock, County Line also issued two press releases.  Prior to June 26, 2018, the last press release the company had issued was five years earlier.

85.     Issuing press releases allowed stock promoters paid by Defendants to generate interest in County Line stock by treating the press releases as significant news events even when they merely reflected changes in personnel.

86.     The digital promotional campaigns came in waves.  First, between July 2018 and January 2019, Defendants paid for at least 49 emails to be sent to thousands of potential investors, through listservs run by paid stock promoters.  During that time, Defendants sold nearly 5 million shares of County Line stock making over $3 million in profits.  Next, from September 2019 to November 2019, Defendants paid for at least another 32 promotional emails and sold over 2.6 million shares of County Line stock for profits of over $700,000.  Finally, from February 2020 to May 2020, Defendants funded at least 62 additional County Line promotional emails and sold nearly 4 million shares for a profit of over $400,000.

87.     The chart below shows the price of County Line stock and the total volume of shares transacted in the public market during the second promotional campaign funded by Defendants.



88.   Many of the Defendants' payments for promotional campaigns went to an entity, Promoter1, that marketed directly to investors, and engaged other promoters on behalf of Defendants.  Promoter1 was run by a then friend of Farber's, Associate2.  Farber was Associate2's point of contact regarding the County Line promotional campaign as well as other campaigns.  Promoter1 ran campaigns to promote at least four penny stocks at Farber's request and received payments from Blue Diamond, Wexford, 0985358, and Black Ridge for those campaigns.  Associate2 believed that the companies who made the payments were either Farber's directly or his through a partnership.

89.   For the County Line campaign, the emails paid for by Defendants tried to persuade recipients to buy County Line stock.  For example, on September 24, 2019, "Penny Stock Locks" sent out an email, subject: "CYLC Upgraded to Strong Buy. Low-Float + History of Monster Breakouts."  The email text stated: "CYLC's chart is screaming bullish with 12-key indicators giving off buy signals."  The email then highlighted the low float, saying it was just "1.485M, which means there is just a little over $379K worth of shares available to the public for

trading.  Put this all together, and you may just have the perfect recipe for a monster breakout."
The email disclosed "We have been compensated ten thousand dollars by [Promoter1] to conduct
investor relations advertising and marketing for CYLC."

90.     Farber hired Promoter1 to promote County Line and at least two other penny
stocks for which Farber used the Farber Controlled Accounts to execute trades.  From at least
August 2017 to June 2019, Promoter1 was hired by Farber to, and did, distribute promotional
emails to retail investors regarding those two other penny stocks.

91.     In addition to promoting County Line directly to investors, Promoter1 also
engaged other promoters, including Promoter2, resulting in Promoter1 being identified in the
disclaimers from those other promoters as the paying party, even though the funds for the
promotions had been originally provided by Defendants.  Other entities, like Promoter2, were
likewise paid by Defendants and used as a middleman so that the disclosure identified that entity
rather than the Defendants as the party paying to promote County Line.

92.     A small portion of the County Line promotions identified Keasberry's Blue
Diamond as the paying party.  This was incorrect—Blue Diamond did not pay for the County
Line promotions.  But Keasberry's other entity, Black Ridge, did pay Promoter1 $160,000
during the time Promoter1 was promoting County Line.  Wexford and 0985358 also paid for
Promoter1 for promotions over that same time frame.  Importantly, potential investors would
also have no way to connect Blue Diamond to County Line.  Unlike Black Ridge, Wexford, and
0985358, Blue Diamond was never disclosed by County Line as a "control person" in public
filings.

93.     Blue Diamond had been used by Keasberry to pay promoters to promote other stocks before the County Line campaign had begun.  Between January and April 2018, Keasberry through Blue Diamond paid Promoter1 $259,000.

94.     The County Line promotions generally disclosed that the paying party, or County Line, or their affiliates "likely wish to liquidate shares of [County Line] at or near the time you receive this communication, which has the potential to hurt share prices," but they failed to indicate that the paying party effectively controlled County Line and was in the midst of bulk selling the largest holding of freely tradable County Line stock.

95.     Defendants knew, or were reckless in not knowing, that the stock promoters that they directly and indirectly hired did not disclose that Defendants 1) were paying for the promotion; 2) were affiliates of County Line; and 3) controlled the float of County Line which they were actively selling into the promotion.  Accordingly, Defendants knew or were reckless in not knowing that the information they were disseminating through their hired promoters was misleading and omitted key information.

96.     One such promotional email was sent by "Beat Penny Stocks" on September 25, 2019, with the subject line: "[Subscriber Name], CYLC stock proves trading is NOT hard."  The email quoted from County Line press releases.  And it stated in bold red text "**CYLC is perhaps *THE HOTTEST INVESTMENT OPPORTUNITY* heading into Wednesday with an upside of 489% and you could be making a very costly mistake by ignoring it.**"

97.     The email also disclosed that the promoter had received compensation from Promoter1 and that Promoter1, County Line, "or their affiliates likely wish to liquidate shares of the profiled company at or near the time you receive this communication, which has the potential to hurt share prices."  Not only was this disclaimer inaccurate— Defendants had in fact been

selling shares to the very investors targeted by the promotion and continued to do so—it was invisible to potential investors.  The disclosure was hidden from view because it was made in white text on a white background, making it unreadable without some manipulation by the recipient (who would not have known it was there).

98.     From September 4 to 24, 2019, Defendants sold 269,080 shares of County Line stock.  In the following three days, after the above email was sent out, Defendants sold another 366,639 shares of County Line taking advantage of the interest generated by the promotions that they paid for.

99.     Along with paying for emails to promote County Line stock to retail investors, Farber also paid an individual to promote County Line stock on social media ("Promoter3"). Promoter3 ran chat rooms where she instructed other social media users on what to say to generate investor interest in County Line.  Many of these messages went out on Twitter and bore no disclosures.

100.   Between June 26, 2018 and May 19, 2020, Defendants' entities paid promoters $1,324,641.

101.   Between July 7, 2018 and May 12, 2020, the promotional campaigns generated enough demand for Defendants to sell nearly 13 million shares of County Line for total profits of over $4.7 million dollars.

102.   From June 15, 2018 through March 30, 2021, funds were distributed from Defendants' entities to the following individuals and entities:



### The Defendants' Unregistered Offers and Sales

103.    Farber, Jamani, and Keasberry are County Line affiliates because of their roles in the management, funding, and operations of the company, and their control of the County Line stock float.  Defendants offered and sold County Line stock.

104.    At the time that Defendants offered and sold County Line stock, there was no registration statement for those sales on file with the Commission or in effect for those transactions, as required by Section 5 of the Securities Act.  No exception from the registration requirement applied.

### FIRST CLAIM FOR RELIEF
### FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES
(Violations of Section 10(b) of the Exchange Act and
Rules 10b-5(a) and (c) thereunder by All Defendants)

105.    Paragraphs 1 through 104 above are re-alleged and incorporated by reference as if fully set forth here.

106.    During the Relevant Period, the stock of County Line was a security under Section 3(a)(10) of the Exchange Act [15 U.S.C. §78c(a)(10)].

107.    Through the conduct described above, defendants Farber, Jamani, and Keasberry, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

108.    Through the conduct described above, defendants Farber, Jamani, and Keasberry violated Exchange Act Section 10(b) [15 U.S.C. §78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R. §240.10b-5(a) and (c)] thereunder and will continue to violate those sections unless enjoined.

**SECOND CLAIM FOR RELIEF**
**FRAUD IN THE OFFER OR SALE OF SECURITIES**
**(Violations of Sections 17(a)(1) and (3) of the Securities Act by All Defendants)**

109.    Paragraphs 1 through 104 above are re-alleged and incorporated by reference as f fully set forth here.

110.    During the Relevant Period, the stock of County Line was a security under Section 2(a)(1) of the Securities Act [15 U.S.C. §77b(a)(1)].

111.    Through the conduct described above, defendants Farber, Jamani, and Keasberry, in connection with the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, (i) acting intentionally, knowingly, or recklessly, employed devices, schemes, or artifices to defraud; and (ii) acting intentionally, knowingly, recklessly, or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

112.     Through the conduct described above, defendants Farber, Jamani, and Keasberry violated Securities Act Sections 17(a)(1) and (3) [15 U.S.C. §77q(a)(1) and (3)] and will continue to violate those sections unless enjoined.

### THIRD CLAIM FOR RELIEF
### MARKET MANIPULATION
**(Violations of Sections 9(a)(2) of the Exchange Act by Farber and Jamani)**

113.     Paragraphs 1 through 104 above are re-alleged and incorporated by reference as if fully set forth here.

114.     Through the conduct described above, defendants Farber and Jamani, directly or indirectly, by use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, effected, alone or with one or more other persons, a series of transactions in a security that was not a government security, that created actual or apparent active trading in that security, or raised or depressed the price of that security, for the purpose of inducing the purchase or sale of that security by others.  This conduct included Farber's and Jamani's acts of engaging in and arranging for securities transactions that affected the volume and prices of that security for the purpose of inducing the purchase or sale of that security by others.

115.     Farber and Jamani acted with the intent to induce trading by others.

116.     Through the conduct described above, defendants Farber and Jamani violated Exchange Act Section 9(a)(2) [15 U.S.C. §78i(a)(2)] and will continue to violate those sections unless enjoined.

### FOURTH CLAIM FOR RELIEF
### UNREGISTERED OFFERINGS OF SECURITIES
**(Violations of Sections 5(a) and 5(c) of the Securities Act by All Defendants)**

117.    Paragraphs 1 through 104 above are re-alleged and incorporated by reference as if fully set forth here.

118.    During the Relevant Period, the stock of County Line was a security under Section 2(a)(1) of the Securities Act [15 U.S.C. §77b(a)(1)].

119.    Through the conduct described above, defendants Farber, Jamani, and Keasberry, directly or indirectly:  (i) used the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been in effect and for which no exemption from registration has been available; and/or (ii) used the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been filed and for which no exemption from registration has been available.

120.    As a result, defendants Farber, Jamani, and Keasberry violated Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§77e(a) and (c)] and will continue to violate those sections unless enjoined.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

A.    Permanently restrain defendants Farber, Jamani, and Keasberry, their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from

violating Sections 5 and 17(a) of the Securities Act [15 U.S.C. §§ 77e, 77q], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5];

B. Permanently restrain defendants Farber and Jamani, their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating Section 9(a) of the Exchange Act [15 U.S.C. § 78i(a)];

C. Order the Defendants to disgorge, with prejudgment interest, all ill-gotten gains obtained through the unlawful conduct alleged in this Complaint;

C. Order the Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

D. Enter an order barring the Defendants from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and 21(d) of the Exchange Act [15 U.S.C. § 78u(d)];

E. Enter an order barring the Defendants from acting as officers or directors of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l], or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.SC. § 78o(d)];

F. Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

G. Grant such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

The Commission demands a jury for all claims so triable.


DATED this 12th day of January, 2024.


                                        Respectfully submitted,


                                        s/ Nita K. Klunder
                                        Nita K. Klunder
                                        Marc Jones*

                                        Attorneys for the Plaintiff
                                        SECURITIES AND EXCHANGE COMMISSION
                                        Boston Regional Office
                                        33 Arch Street, 24th Floor
                                        Boston, MA 02110
                                        617-573-8822 (Nita Klunder)

*Not admitted in the U.S. District for the Southern District of New York